IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CHARLES E. McCULLEY, III,

Plaintiff,

vs.                                          Case No. 02-1340-JTM

UNITED STATES OF AMERICA,

Defendant.

## MEMORANDUM AND ORDER

On September 10, 1997, McCulley, an employee of IBM, was injured in a car accident in Fort Riley, Kansas, when his car was struck by another vehicle driven by Army Private Hector Ruiz-Velazquez. McCulley has brought the present action against the United States as the employer of Private Velazquez. There are cross-motions for summary judgment as to whether the matter was resolved when Velazquez's private insurer issued a settlement check to McCulley. In addition, the defendant United States has moved for summary judgment on the issue of whether Velazquez was within the scope of his employment at the time of the accident. For the reasons identified herein, the court will grant summary judgment in favor of defendant.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).


**Findings of Fact**

On September 10, 1997, McCulley, an employee of IBM, was injured in a car accident in Fort Riley, Kansas, when his car was struck by another vehicle driven by Army Private Hector Ruiz-Velazquez.  Ruiz-Valezquez was driving his personal vehicle.  McCulley was driving through the Army base to perform routine maintenance on a check sorter at a local bank in conjunction with his employment at IBM.

McCulley was initially triaged and stabilized at Fort Riley and medivaced via air ambulance to the University of Kansas Medical Center with life threatening trauma.  His injuries included a closed head injury, ruptured spleen, bilateral pneumothoraces, sinusitis, left pulmonary contusion,

pancreatitis, hypernatremia, and dehydration.  His medical expenses to date are in excess of $323,914.00.

Velazquez was an enlisted private in the Army during 1997, and on the date of the accident, and throughout 1997, his permanently assigned duty station was Fort Riley, Kansas.

Fort Riley Army Post was an open post during 1997, which means that any member of the public could travel on and through Fort Riley without restriction, as there were no military checkpoints at which vehicles had to stop prior to entering or exiting the post.  Army regulations required only that vehicles be properly registered and insured.

Throughout 1997, Battalions at Fort Riley rotated through three duty cycles — green, amber and red.  Red cycle is Garrison duties, in which Battalion members are assigned a variety of on-post duties including honor guard, equipment maintenance and post beautification such as mowing grass. No military field training duties are assigned during Garrison.

On September 10, 1997, and for approximately two weeks prior to the accident, Velazquez had been assigned to a grass mowing detail on main post, as his Battalion was in red cycle or in Garrison.

At the time of the accident, Velazquez had been released from his duties for his lunch period. McCulley stresses that military commanders retain at all times the residual authority to issue commands to soldiers, even over lunch, if necessary for "the accomplishment of the mission." (Plf. Exh. H, Harris dep. at 69). However, it is clear that on the day of the accident, Velazquez was not performing any task for the Army during his lunch period.

Each morning the soldiers assigned to the mowing detail would report for duty at the Main Post Building, where they would perform their morning mowing duties, then be released for their lunch period, after which they were to report back to the Main Post Building to perform their afternoon mowing duties.

For his own convenience, Velazquez drove himself in his personal vehicle to and from his mowing detail on the day of the accident.  Before September 10, 1997, Velazquez had sometimes

3

ridden to the mowing detail with other soldiers in their privately-owned vehicles. The Army provided transportation to the mowing detail, but Velazquez — like most of the soldiers — chose not to take the Army-provided transportation; he preferred to take his own vehicle so that he could go where he wished during lunchtime. Velazquez was traveling to his barracks to eat lunch when the accident occurred.

Valezquez, as well as all other soldiers living on base without dependents are provided a meal card which they may use at any dining facility on base. Soldiers with dependents are provided a basic allowance for subsistence instead of a meal card. Velazquez lived on base in barracks housing and had a meal card.

During his lunch period, Velazquez was free to go and do what he wished, including leaving the base. He was only prohibited, like all soldiers, from going to certain, designated "off-limits" facilities. He was not required to eat at the on-base dining facilities. Velazquez was free to choose the route he drove on the day of the accident; he selected the most convenient for his purposes. While driving on his lunch period, and prior to the accident, Velazquez drove by at least one dining facility at which he could have eaten.

Velazquez was not disciplined by the Army following the accident. He was not paid or reimbursed by the Army for the use of his personal vehicle at any time while assigned to the mowing detail.

Allstate insured Ruiz-Velazquez, providing $25,000 property damage coverage per accident and $25,000 bodily injury coverage per person.

On November 21, 1997, the plaintiff and his wife, Sally McCulley, entered into an employment agreement with Stan Oyler providing for representation of claims "as a result of the negligence of Hector G. Ruiz-Velazquez (and all other persons who may be liable), on or about the 10 day of September, 1997," and further providing that "[it] is understood and agreed that said attorneys shall not be entitled to any compensation for their services unless and until settlement or collection of said claim has been made and that said attorneys shall have no right to compromise or

settle said claim without my/our consent." (Def. Exhibit 9.)  Oyler also represented McCulley with respect to his worker's compensation claim against IBM and Liberty Mutual.

On November 24, 1997, Oyler notified the Allstate claims department by letter that he had been retained to represent plaintiff with respect to the September 10, 1997 accident and the plaintiff's claim for injuries suffered. (Exhibit 12.)

On December 4, 1997, McCulley filed a workers compensation claim against IBM and its workers compensation carrier, Liberty Mutual, for injuries sustained in the car accident.

On February 17, 1998, Darla C. James, the Allstate adjuster who handled McCulley's bodily injury claim prior to Roxanne Dale Kelly, made the following entry in the Allstate computer diary:

> CALLED ATTY - STILL NOT READY TO ACCEPT MONEY BECAUSE OF W/C - HEARING THIS WEEK ON THAT - HE DIDN'T KNOW ABOUT ARMY LIEN AND REQUESTS COPY - TAKING INSDS DEPO THIS WEEK ON THE W/C HEARING.

(Def. Exh. 21, 22).

On September 3, 1999, McCulley filed a state court negligence action in the District Court of Geary County, Kansas, against Hector G. Ruiz-Velzuez [sic], alleging personal injury damages in excess of $75,000.

On September 8, 1999, Oyler filed an administrative claim on behalf of plaintiff with the United States Army.  In his administrative claim under "Basis of Claim," McCulley alleged:

> Claimant was struck by a U.S. Government employee on Ft. Riley's premises.  See attached police military report that Hector G. Ruiz-Velzquez failed to obey a traffic control device, and/or upon information and belief the military failed to adequately sign the dangerous intersection with an appropriate warning sign or stop ahead sign. The negligence of Ruiz-Velazquez is imputed to the U.S. Government under the principals of respondeat superior.

(Def. Exh. 44).

On April 20, 2000, Stan Oyler served a copy of the Geary County negligence petition on Allstate Insurance Company directed to the attention of claims representative Sandra Billings.  Oyler wrote:

> On September 3, 1999, we filed a lawsuit against your insured, Hector G. Ruiz-Velazquez. A copy of the Petition is enclosed. We had trouble serving Mr. Ruiz-

Velazquez as he had left the army, moved back to Puerto Rico, then to Miami, and apparently back to Puerto Rico. He was served on February 11th and a copy of the Affidavit of Service is also enclosed. No answer has been filed and we are sending you this letter notifying you of service on your insured so that you may take appropriate action to defend your insured in the above lawsuit.

(Def. Exh. 14).

On May 7, 2000, the United States Army denied plaintiff's administrative claim.

On May 8, 2000, Oyler wrote to Darla James:

This letter is to follow-up our telephone conference of May 5th with respect to the lawsuit we have filed in Geary County, Kansas, against your insured, Hector Ruiz-Velazquez. As indicated, we do not intend to take default judgment at this point in time to allow you to file an answer. In any event, as I indicated, you have no need to file an answer for at least another 10 days as I will be talking to the United States Army about the claim made against it with respect to the incident in question.

(Def. Exh. 15).

On May 18, 2000, Oyler wrote to James:

This letter is a follow-up to our telephone conference of May 12th with respect to the lawsuit we have filed in Geary County, Kansas against your insured, Hector Ruiz-Velazquez. As indicated, we do not intend to take default judgment at this point in time to allow you to file an answer. In any event, as I indicated, you have no need to file an answer for at least another 10 days. I will notify you prior to taking any further action on the pending lawsuit so as to provide you time to hire a lawyer to defend your insured.

(Def. Exh. 15).

On September 5, 2000, James made the following entry in the Allstate Computer diary:

UPDATE - HAVE HAD NUMEROUS INTERACTIONS WITH ATTORNEY STANLEY OYLER WHICH I HAVE FAILED TO UPDATE IN CDS. ALL OF OUR CONVERSATIONS HAVE CONFIRMED THAT HE IS STILL TRYING TO RESOLVE THE W/C (WITH ARMY) LIEN AND DOES NOT WANT A CHECK ISSUED. HE HAS ASSURED ME ON THE PHONE AND BY THE SENTENCE "I WILL NOTIFY YOU PRIOR TO TAKING ANY FURTHER ACTION ON THE PENDING LAWSUIT SO AS TO PROVIDE YOU TIME TO HIRE A LAWYER TO DEFEND YOUR INSURED" WHICH HAS BEEN INCLUDED IN WRITTEN CORRESPONDENC [sic] THAT THIS FILE COULD JUST AWAIT AN UPDATE FROM HIM. I HAVE KEPT IT AT MY DESK ON THIS BASIS. HE HAS INDICATED THAT THIS COULD BE A LONG PROCESS, IS AWARE WE ARE READY TO ISSUE A CHECK FOR OUR LIMITS AT ANY POINT AND THAT THERE IS NO HESITATION ON OUR END TO SETTLE THIS CLAIM. LEFT A C/B FOR HIM TODAY TO GET ANOTHER UPDATE AS LAST WRITTEN COMMUNICATION FROM HIM WAS 5/18/00.

(Def. Exh. 21).  James also wrote:

ATTORNEY C/B AND CONFIRMED THAT HE STILL WANTS US TO JUST SIT, THERE IS NO REASON FOR OUR LEGAL DEPARTMENT TO HAVE THIS AS HE IS NOT GOING TO DO ANYTHING WITH US ON IT, WILL LET ME KNOW WHEN READY TO GET OUR 25K. WILL SEND ME ANOTHER LETTER TO THAT EFFECT BUT DOESN'T UNDERSTAND WHY. ADVISED I JUST NEED DOCUMENTATION FOR MY FILE. HE AGREED TO SEND ME SOMETHING BUT SAID TO JUST "SIT TIGHT".

(Id.)

Oyler wrote to Lois Mitchel at Liberty Mutual on October 23, 2000, stating:

This letter is a follow-up to our telephone conference where I advised my client was willing to accept the sum of $65,000.00 to settle his workers compensation claim. The $65,000.00 to be paid out with $25,000.00 cash up front and the remaining $40,000.00 to be paid on a structured settlement over a period of 13 years with payments to begin December 1st. It is my understanding you will be checking with your structured settlement people to see what type of a pay out you can get in that regard. Additionally, as part and parcel to the settlement, Liberty Mutual waives its right to any and all insurance proceeds from Allstate Insurance on behalf of their insured, Hector Ruiz- Velazquez. Allstate has represented that their policy limit is $25,000.00 and I enclose herein documentation from Allstate confirming that amount. Finally, Liberty Mutual does not waive its right of subrogation in the event there is any recovery from the United States Army. As explained to you, in September of 1999, I filed a federal tort claim on behalf of Mr. McCulley. To date the Army has not responded to that claim. I further explained to you my client has authorized me to go ahead and accept the $25,000.00 from Allstate and by doing so, more probably than not, that would prejudice any rights we may have against the United States Army. It is my understanding that you are agreeable to that. I do not intend to pursue the United States Army further once the settlement set forth in this letter is completed. You should consult with your own attorneys regarding the merits of the claim against the United States Army.

(Def. Exh. 17).

On February 1, 2001, McCulley, Oyler, and John Graham of Liberty Mutual appeared at a worker's compensation settlement hearing. Oyler placed into the worker's compensation record the following statements:

Also, as part and parcel of this, the claimant has agreed that there is a — to endorse over any settlement check he may get from the tort-feasor in the car wreck. Which there is now pending in the District Court of Geary County, Kansas, a lawsuit against the tortfeasor, Mr. Rodriquez [sic], I think it is, where Allstate is the insurer and has a $25,000 policy. And the parties have agreed that the — that the claimant will endorse the check as the respondent has a lien in excess of that amount. And in addition, I think all parties acknowledge that there is also filed a claim against the United States Government regarding this matter and the United States Army, the Federal Tort Claims Act case. And that by accepting the $25,000 check Allstate, that may, in all probability, compromise and extinguish any right to go against the United States Army at a later date, in the event that Mr. McCulley signs a release releasing

7

the tort-feasor for the acts related to this particular incident and accepts the 25,000. All of which are part and parcel to the settlement, I believe, Mr.Graham, are they not?"

(Def. Exh. 11).

During the same hearing, Oyler and plaintiff had the following conversation on the record:

Mr. Oyler:  Basically we're not giving up anything. They're just paying $351 a week is all they're doing. The only thing that's compromised here really is whether we can continue to pursue the United States Army when we make a claim against and release a potential employee of the United States Army. And what I'm telling you is more probably than not the law would say if you release the employee, you release the employer, to wit, the United States Army and you couldn't pursue that claim. Do you understand that? Which means if we settle this thing, we take the 25,000, and we give up our - - and we dismiss our case in Geary County, which we'll have to do, then the- - we can't- - we can't go back later and make a claim against the driver, and more probably than not we can't even make a claim against the United States Army. Do you see that? Do you remember me telling you that and telling you we didn't have much of a claim anyway, it was unlikely we would recover?

Mr. McCulley: Yeah.

Mr. Oyler: I think I sent you a fair amount of correspondence –

(Def. Exh. 11).

McCulley then stated, "But we don't have to have to settle with Allstate?," to which Oyler responded:

No, we can continue to pursue Allstate, but its obvious the man who ran into you, when you're looking at his personal assets he doesn't have any. . . Our only chance is to somehow impute or find that he was in the scope of his employment when he struck you with that car so that the United States Army would have to pay whatever your claims were. Assuming it's — assuming it's two million dollars, then they'd have to pay that, if we were successful against them. What my opinion has been is, more probably than not we're not going to be successful. I don't think we're going to make it — we're going to be successful. I have filed a Tort Claims Act with the federal government on your behalf. It's been on file since September of '99. There's been no decision rendered on it.  It's unfortunate there hasn't been, it would make this easier. But in any event, that's where we're headed with this. Do you understand that?"

McCulley responded "Yeah." (Id.)

Sally McCulley then clarifies that by being at the worker's comp hearing they are not agreeing to take the Allstate claim, to which McCulley interjected: "That just shuts down the other." Oyler then stated: "That just shuts down the other, right. He understands."  McCulley said, "We're not going to shut it down."  Oyler told McCulley he can reach a final decision about pursuing

8

Velazquez or the United States Army at a later date, but that plaintiff needs to understand that the worker's compensation carrier has a lien on any proceeds plaintiff would receive, to which plaintiff responded, "Okay." (Def. Exh. 11).

At some point following the worker's compensation hearing, McCulley changed his mind about endorsing over all of the proceeds he might receive from Allstate on behalf of Velazquez.

Prior to June 13, 2001, Oyler told plaintiff that Oyler did not believe a claim against the United States government would be successful.

According to Allstate's records and the deposition testimony of Roxanne Dale Kelly, Oyler called Kelly on March 20, 2002, and told her he wanted to settle for the policy limits. Before this call, Oyler and McCulley had an office conference, which Oyler summarized in a letter to his client:

> This letter will serve to confirm the office conference with you and my telephone conference with Sally wherein we discussed in detail the merits of pursuing the United States government. As indicated, in my opinion there is no claim against the United States government and we should go ahead an [sic] accept the $25,000 from Allstate Insurance Company who insured the other driver. Undoubtedly, Allstate will want a release executed and you and Sally will need to sign that. I have discussed this case with the work comp carrier who is entitled to reimbursement out of any settlement. As discussed also with you, you are entitled to be reimbursed payment for your loss of consortium claim. Obviously the $25,000 is grossly inadequate and becomes even more inadequate when the fees and expenses are deducted. You have given me authority to agree with the work comp carrier to allow the Court to determine after deducting fees and expenses as to how much your share is and how much is the work comp carrier share. I am at this time contacting Allstate and having them forward to me the settlement check and release and we will be back in touch with you in that regard as soon as practical.

(Def. Exh. 10).

On or about April 5, 2002, Roxanne Kelly of Allstate Insurance Company issued a check for $25,000 and sent the check to Oyler. The check was payable to "Charles McCulley and Oyler & Pauzauskie, his attorney and Department of the Army Workman's Compensation Lienholder." (Plf. Exh. E). The check, dated April 5, 2002, states, "VOID IF NOT PRESENTED WITHIN THREE HUNDRED, SIXTY FIVE DAYS OF THE DATE OF ISSUE." In the left upper corner of the face of the check, the following is printed:

INSURED HECTOR RUIZ-VELASQUEZ [sic] CLAIMANT CHARLES MCCULLEY IN FINAL SETTLEMENT OF ANY AND ALL CLAIMS PAYMENT ARISING FROM BODILY INJURY CAUSED BY OF ACCIDENT ON 09/10/97.

Sometime between April 5 and May 13, 2002, McCulley endorsed the back of the check.

On April 19, 2002, Oyler sent the Allstate check to Denise Creager of the Army, accompanied by the following letter:

> The undersigned represents Charles McCulley arising out of an accident of 10 September 1997 where in he was seriously injured. You had previously sent to Allstate Insurance a notice of lien dated 20 January 1998 a copy of which is enclosed. Pursuant to our telephone conference of April 18th it is my understanding that the Department of the Army no longer has the lien and has been paid in full. Notwithstanding that since Allstate Insurance had notice of your lien they have put the name of the Department of the Army on the check and would require the appropriate endorsement so that the check can be negotiated. It is my understanding that your office has the authority to endorse on behalf of the Department of the Army and will do so and return the check to me. Further, it is my understanding that you no longer claim any lien to the proceeds from the Allstate settlement check.

(Def. Exh. 24). The Department of the Army endorsed the Allstate check and returned it to Stan Oyler.

On or about May 7, 2002, Oyler sent a letter and the Allstate check to Sherri J. Plisch, Senior Recovery Specialist for Liberty Mutual Central Recovery Unit, with a carbon copy to his client, which stated:

> I am in receipt of your letter dated April 26, 2002. I have just recently received the policy limits of $25,000 from Allstate Insurance. The check required the endorsement of the Department of the Army and I forwarded to and received back on April 26th the endorsement of the U.S. Army. They are not claiming a lien in these proceeds.
>
> I have discussed this matter with my client. The case in Junction City is dismissed, so we either need to do one of two things, (1) file a new lawsuit to have the court determine who gets what out of the settlement, or (2) submit to binding arbitration and let a mediator/arbitrator decide the issue with no rights for appeal and conclude the matter in the next few days.
>
> My personal preference is that we all agree upon a person to mediate this matter and then let them decide who gets what, then the money is disbursed accordingly. We can avoid any unnecessary expense, have the issues decided very quickly and move on to something else.
>
> I was originally employed pursuant to a written agreement, a copy of which is attached. An itemization of my expenses and attorneys fees are enclosed. My client has signed off on the proposed distribution. My proposal as far as the money is concerned is that I be paid out of the $25,000 policy limits the sum of $8,855.04 with the remainder to be deposited in my trust account and remain there until such time

as the court of law or mediator has determined the distribution between Liberty Mutual and the McCulleys.

Finally, I enclose herein the $25,000 settlement check from Allstate Insurance Company. Please endorse the check and return it to me. If you are in agreement with the above procedure as far as holding the proceeds in my trust account please acknowledge in writing so that we can negotiate the check. And secondly, let me know what your thinking is as far as having a mediator decide what Liberty Mutual and the McCulleys get out of the $25,000 proceeds.  I am not interested in using American Arbitrators Association or the other formal service as they are (1) slow, and (2) too expensive.

(Def. Exh. 25).

On May 10, 2002, Oyler sent McCulley the following letter:

Enclosed herein is a letter dated May 7th, from the Department of Army denying your Federal Tort Claim filed with them. Unfortunately I tend to agree with their opinions that your claim as far as the United States Army is concerned is not compensable. You would have six months or through and including October 7, 2002 within which to file a lawsuit. I do not intend to file a lawsuit against the United States Government regarding your claim arising out of the September 7, 1997 accident. If you desire to pursue that matter you may contact another attorney of your choosing. It is my belief that you would be unsuccessful in such litigation. If you want to pursue that with another attorney I would suggest that you do so immediately.

We still have the issue of wrapping up the $25,000 from Allstate Insurance Company. I have the check in my office which you need to endorse so that I can forward it on to Allstate [sic] and deposit it in my trust account. Please call my office upon receipt of this letter and make an appointment so that we can conclude that portion of your claim.

(Def. Exh. 26).

On May 10, 2002, Oyler wrote again to Pilsch.

Enclosed herein is a letter from the Department of Army denying the claim that we filed on behalf of Charles McCulley. I agree with the conclusion stated in the letter and I have told my client that I will not be filing a lawsuit on his behalf in that regard. I am sure that you are welcome to litigate this matter on your of accord and you can consult with your own in-house counsel regarding what your rights and obligations are should you desire to pursue the matter. I will not be filing a lawsuit on behalf of Mr. McCulley. You would have six months from May 7, 2002 within which to file a lawsuit or your claim would thereafter be forever barred.

(Def. Exh. 27).

On May 13, 2002, McCulley signed a document entitled "SETTLEMENT DISTRIBUTION" which contains the following reference at the top of the document: "RE: CHARLES MCCULLEY v. Hector G. Ruiz-Velazquez." (Def. Exh. 28).  The document contains various categories under the title, the first of which is: "TOTAL SETTLEMENT," across from which appears "$25,000."  The

11

document also sets out Oyler's attorney fees and expenses in the amount of $8,855.04.  The document states:

> The undersigned have reviewed the above accounting regarding the $25,000.00 proceeds from the insurance carrier Allstate of Hector Ruiz-Velazquez arising out of the accident of 9-10-97 and understand that is all the money we will be receiving from Allstate Insurance Company. The parties understand that Liberty Mutual Insurance Company claims a lien on the net proceeds and that a dispute has arisen between Charles McCulley and Liberty Mutual as to how the proceeds are to be disbursed. In an attempt to negotiate the check and resolve the disputes the parties agree Stanley E. Oyler is to be paid out of the proceeds the sum of $8,855.04 as attorneys fees and expenses and that the remaining balance of $16,144.96 shall be deposited in the trust account of Oyler & Pauzauskie pending resolution of the issue of the interest of Liberty Mutual and Charles McCulley on such sum. Neither party waives any rights whatsoever with respect to claiming an interest in the $16,144.96 by signing this document. We understand we have the right to have the Court determine the reasonableness of attorneys fees and expenses.

On June 24, 2002, Oyler e-mailed McCulley that "I sent the check to Liberty Mutual to sign and they wouldn't sign and they were going to consult with their attorneys regarding determining who gets what out of the check —  I am still waiting to hear back from them."  (Def. Exh. 29).

On July 2, 2002, McCulley e-mailed Oyler: "Stan, I will be needing a copy of my account to see if another LAWYER will pursue the ARMY. Will let you know on when I will be in Topeka to pick it up...."  (Def. Exh. 30).  Oyler responded: "We will have everything ready by Wednesday of next week for you. Since the issue with the Army is liability, I'll include the libility [sic] related portion of the file. If you can find someone to take it I can reproduce the medical."

On July 5, 2002, McCulley e-mailed Oyler that his father had found a lawyer in Wichita that might pursue the Army.

On September 18, 2002, Oyler sent McCulley the following letter:  "Enclosed is a copy of a letter from Liberty Mutual making various offers attempting to resolve the $25,000 settlement with Allstate. Please review the enclosed letter and give me a call." (Def. Exh. 32).

On September 27, 2002, McCulley filed the current lawsuit against the United States.

On November 15, 2002, Oyler wrote McCulley

> I have now placed the above matter in suit per our recent discussion. A copy of the Petition is enclosed for your files.  I will keep you advised as this matter develops. As you know, Liberty Mutual has suggested that you receive approximately

12

> $3,400.00 out of the $16,000 plus net proceeds, and your suggestion was that it be spread equally between the two of you. It appears Liberty Mutual has no interest in that proposal.  In view of the above, the Court may determine who should get what.

(Def. Exh. 34).

Liberty Mutual informed Oyler that it was the company's policy to sign such checks last, retain its allocation of the proceeds, and then disburse the remaining funds to the proper parties.

On November 15, 2002, McCulley (represented by Oyler) filed suit in Shawnee County District Court against Liberty Mutual to enforce payment of the proceeds of the check and seeking the court's determination as to the distribution of the settlement proceeds from the Allstate check.

On December 3, 2002, the United States filed its answer in the present suit.

On January 8, 2003, John Graham, counsel for Liberty Mutual, faxed Oyler:

> This is to confirm our telephone discussion today regarding resolving the above referenced subrogation matter. As we discussed, my client is willing to lower their demand from $12,500 to $10,827 to settle their claim to the proceeds of the $25,000 third party recovery. They have advised that this is a low as they are willing to go. I believe your client will have a difficult time proving any of the $25,000 third party recovery is for loss of consortium due to the allocation of the settlement check. In addition, I believe the Judge would allow us the entire $16,144.96 based on our medical specials of $200,000. However, they are willing to take the $10,827 which represents a split of where the parties were prior to the lawsuit. Your client was willing to pay $8072, and we had wanted $12,500.  Please review with your client and advise accordingly.

(Def. Exh. 37).

On January 13, 2003, Oyler wrote his client McCulley:

> Further, regarding the $45,000 [sic] settlement from Allstate Insurance Company, after deducting my fees and expenses, there remains a total of $16,144.96. Liberty Mutual is willing to accept the sum of $10,287 which would leave a remainder of $6,144.96 for you. Please call me on Liberty Mutual's proposal with respect to the Allstate settlement proceeds.

(Def. Exh. 38).

On January 31, 2003, Oyler wrote to Graham:

> Enclosed herein is Allstate Insurance Company check #95662563 dated April 5, 2002, in the amount of $25,000. It has been endorsed by the Department of the Army and Charles McCulley and needs to be endorsed by Liberty Mutual so that it can be return [sic] to me for further endorsement and deposit [sic] in my trust account. We

13

> would appreciate your prompt attention as we are only two months away from expiration of the check. Additionally, please forward a Journal Entry reflecting our Settlement Agreement when you return the check.

(Def. Exh. 39).

By January 31, 2003, McCulley and Liberty Mutual had reached an agreement regarding the distribution of the Allstate check proceeds. Oyler believed he had worked out an agreement with Liberty Mutual whereby it would endorse the check, return it to him, and he would deposit it in a client trust account.

On March 7, 2003, Graham sent the following letter to Judge Parrish in the Shawnee County suit, with a carbon copy to Oyler:

> Please be advised that the parties have reached a settlement agreement in the above referenced case and are currently in the process of preparing a release as well as the dismissal documents with the Court. As such, I believe there will not be a need for the Case Management Conference as set forth in your February 28, 2003 notice. If you have any questions concerning this or any other matter please feel free to contact either myself or Stan Oyler who represents the McCulleys.

(Def. Exh. 40).  The letter to Judge Parrish was filed in the court record.

On March 10, 2003, Oyler sent Liberty Mutual a letter indicating that he was still waiting on the return of the check and inquiring into its status.  He wrote:

> Sometime ago I sent you the settlement check from Allstate, the insurance company. As indicated, the check is about to go stall [sic]. You need to return that promptly. We had worked out a settlement agreement and I thought you were going to prepare an Order reflecting the agreements so we could close out the file but I have heard nothing from you for several weeks. Please send back the check with your clients' endorsement thereon so I can put it in my trust account and also forward me an Order reflecting the settlement so we can disburse the money.

(Def. Exh. 46).

Allstate check number 956625633 was negotiable for 365 days following its issuance.  The check was never cashed and was cancelled.  On April 5, 2003, the check became void for lack of presentment.

On July 3, 2003, Oyler executed an affidavit in the present action wherein he stated that the Allstate check "has apparently been lost in the mail." (Def. Exh. 42).

14

Oyler moved to dismiss the Shawnee County lawsuit against Liberty Mutual, which was granted by agreed Journal Entry dated August 4, 2003.

On June 11, 2004, McCulley withdrew and dismissed his claim against the United States government for negligent signage at the intersection where the accident occurred.

Allstate claims adjuster Roxanne Dale Kelly testified that, in around March of 2002, attorney Oyler called and wanted settlement of policy limits. On September 7, 2000, Kelly noted in the claims file: "received file, awaiting work comp lien to settle to release our limits of 25,000." (Plf. Exh. C). On December 15, 2000, Kelly noted: "Limits have been offered a long time ago, awaiting work comp to settle." Kelly issued the check on April 5, 2002, the adjuster issued the check. Kelly admitted that she never had a conversation with Oyler wherein he agreed to have his client execute a release as a condition of issuing the check. Her file does not reference a release being sent along with the check. It is her practice to send a release, but in this instance she has no personal memory of sending a release along with the check.

There is no release in the Allstate file. There is no indication in the Allstate file that a release was sent to Oyler. Kelly did not know whether Velazquez knew that Allstate was issuing the check. Kelly could not recall whether she discussed any release of Velazquez with McCulley's attorney.

Kelly testified she does not require execution of a release prior to issuing a check, as she believes the insured is released from liability when the check is cashed. She considers the cashing of the check to be a full and final release based on the language contained on the front of the check. She stated that she sends a release contract with a settlement check because it is Allstate's practice to get a contractual document that specifically releases its insured if a payment is made on the policy.

Allstate's company policy requires that all release documents and/or dismissal documents on a claim be executed and returned prior to sending payment on a claim. Adjuster Kelly did not follow this policy. Kelly testified that she would not have issued the $25,000 check if Oyler had told her that McCulley would not sign a release

15

Oyler has testified that Kelly told him Allstate wanted to pay its policy limits in light of the claim being substantial.  He told her that his client was not going to sign a release, but would accept a tender of Allstate's policy limits. Kelly said Allstate just wanted to pay its policy limits and close their file.  Oyler understood that Allstate's sending the check was its tender of policy limits.  He interpreted the printing on the upper left quadrant of the face of the check to be Allstate's internal memorandum and not to constitute release whatsoever. Oyler recalls telling McCulley that the language on the front of the check did not constitute a release.   He testified he did not receive any paper work, release or cover letter accompanying the Allstate check.

Oyler testified that, after he believed the Allstate check was lost, he never contacted Allstate for a replacement check because of McCulley's current suit against the United States. He testified that it is his regular practice to send copies of letters to his clients where the letter indicates the client is carbon-copied. When asked about his March 21, 2002, letter to McCulley, and the office conference it references, Oyler testified that he would not have contacted Allstate to have them forward the settlement check and release unless he had previously discussed that issue with McCulley. He testified that he had discussed with McCulley the fact that Allstate would want a release and that McCulley would have to sign it if they wanted to take the $25,000.  He believed McCulley was willing to sign some sort of release.

Prior to representation of McCulley, Oyler had represented other Allstate claimants.  In Oyler's experience, when Allstate settles a claim, it sends a "Release of All Claims" document which specifically states who is being released along with a check.  According to Oyler, McCulley was only willing to accept the tender without signing a release, as he understood that signing a release would kill his claim against the Government.

Plaintiff McCulley has testified that he never saw a release from Allstate, and never signed a release.  He never told Oyler that he was willing to sign a release to Allstate. He believed that, because a release was not provided with the $25,000 check, that he could continue to pursue his claim against the United States. He endorsed the check for it to be sent to Liberty Mutual, so Liberty

Mutual could get their funds — the $25,000.  He never looked at any language on the front of the check.  He has never received any funds from Allstate.

> The United States' First Request for Admissions at 4, states:

> You received and endorsed a $25,000.00 check issued by Allstate Insurance Company dated April 5, 2002, in payment of your claim against Hector Ruiz-Velazquez for personal injuries you received on September 10, 1997, a true and accurate copy of which is attached hereto as Exhibits 2 (check number 95662563) and 3 (backside endorsement).
> ADMIT_____   DENY_____

To which, Mr. McCulley responded:

> Objection. Vague, compound, ambiguous, calls for a legal conclusion. Without waiving these objections, plaintiff admits that he received and signed the back of the check. Plaintiff denies that the check was to be for complete payment or release of Hector Ruiz-Velazquez or the United States of America. No formal release was provided. Further, plaintiff repudiates the endorsement if it is contended to have any legal implication that would release the United States of America from respondeat superior liability. The Allstate check has not been cashed and is apparently lost.

McCulley testified at his deposition on August 23, 2004, that he has no memory of the February 1, 2001 worker's compensation hearing. He testified has no memory of any legal action Oyler took on his behalf involving Velazquez, that he is unable to remember the details of many of the conversations he had with Oyler, and that he has no memory of attending the office conference referenced in Oyler's March 21, 2002, letter addressed to McCulley.

The 1997 Mercury Cougar which plaintiff McCulley was driving at the time of the accident was a total loss.  The car was jointly owned by the plaintiff and his wife, Sally McCulley, which was originally purchased for $17,822.50  McCulley received payment on his claim for property damage to his 1997 Cougar from Hector Ruiz-Velazquez, through Velazquez' insurer, Allstate.  On or about October 10, 1997, Allstate issued a check to Sally McCulley, as co-owner of the vehicle, for $19,312.77, which represented the replacement value of the vehicle.  Sally McCulley endorsed the Allstate property damage check shortly thereafter and it was deposited.  The check was paid by Allstate in October, 1997.  A replacement 1997 Mercury Cougar was purchased by the McCulleys with the Allstate property damage check proceeds.  Charles McCulley still owns and drives the replacement vehicle.

17

**Conclusions of Law**

The court finds that the defendant has a valid defense to the claims raised here under the Kansas common law doctrine of accord and satisfaction.  An accord and satisfaction "is a method of discharging a contract or a cause of action whereby the parties agree to give and accept something in settlement of the claim or demand of one against the other, the 'accord' being the agreement and the 'satisfaction' being its execution or performance." *Lippert v. Angle*, 215 Kan. 626, 629-30, 527 P.2d 1016, 1019-20 (1974).  Consideration in an accord and satisfaction is supplied by the settlement of a disputed claim.  *Fisher v. Stinnett*, 212 Kan. 26, 509 P.2d 1156, 1162 (1973).

Mere retention of a check tendered as payment in full will not operate as an accord and satisfaction where the creditor promptly objects to the sum tendered as full satisfaction.  *Lighthouse of the Blind v. Miller*, 86 P.2d 508, 509 (1939); Kohn v. Babb, 461 P.2d 775, 781 (Kan. 1969).  Additionally, where a check is issued and on its face is noted "payment in full," the intent of the creditor is immaterial if the check is accepted and used beyond mere retention.  *Weidensaul v. Greenhouse Rest. of Lawrence, Inc.*, 13 Kan. App. 2d 95, 762 P.2d 196, 197-98 (1988); *Hoeppner Constr. Co., Inc. v. United States*, 273 F.2d 835, 838 (10th Cir. 1960).

Here, McCulley accepted and used the Allstate check beyond mere retention.  At the workers compensation hearing, he agreed to endorse the check over to Liberty Mutual.  After receiving the check, sent  it to the Army for its endorsement.  Then he endorsed it.  Counsel for McCulley then began a series of negotiations with Liberty Mutual as to how the proceeds of the check would be distributed, and McCulley and counsel privately agreed as to the fees to be paid from the check.  During the year-long life of the check, McCulley through counsel actively sought to negotiate and cash the check, engaging in a series of actions far beyond that of mere retention.

McCulley argues there was no meeting of minds, and thus the accord and satisfaction cannot be binding.  In support of his argument, he stresses his private intention, never communicated to Allstate, Ruiz-Velazquez, or Liberty Mutual, that he did not wish to release the tort-feasor by accepting and endorsing the Allstate check.  The law of accord and satisfaction cannot be so easily

circumvented.  Accord and satisfaction arises when a party accepts a check issued in full satisfaction of a debt; proof that the recipient understood the legal consequences of the acceptance is not controlling.  *Amino Bros. Co. v. Twin County*, 206 Kan. 68, 476 P.2d 228, 231-32 (Kan. 1970).  Nor is it a defense that the acceptor of the check did not read the contract prior to signing it.  *United States Fid. & Guar. Co. v. Burress*, 844 F.Supp. 1475, 1481 (D. Kan. 1994) (applying Kansas law).  Thus, McCulley's current averrals that he did not read the release language is unavailing.

McCulley's response otherwise depends upon distinguishable cases from outside Kansas.  The court in *Guitierrez v. Schultz*, 109 Ill. App.3d 372, 440 N.E. 2d 451, 455 (1982) concluded no accord and satisfaction arose based in part on the failure of the check to conspicuously state that it operated as a release or settlement.  That is not the case here.  As noted above, the check plainly stated that it was "IN FINAL SETTLEMENT OF ANY AND ALL CLAIMS ... ARISING FROM BODILY INJURY CAUSED BY OF ACCIDENT ON 09/10/97."

*Sorrye v. Kennedy*, 699 N.Y.S.2d 214, 267 A.D.2d 587 (1999), another case relied upon by the plaintiff where the court found no accord and satisfaction, was decided in part based upon the fact that the claimant and the tortfeasor were both represented by the same insurer, and the insurer had previously represented to the claimant that the check containing the proposed accord would be for property damages only.

Here, McCulley was actively represented by counsel.  The facts, as related above, clearly establish that both counsel and client actively anticipated, before the Allstate check was issued, that Allstate would require a settlement or release.  Further, they actively considered the likely effect of such a release, rendering improbable any successful claim against the Army.  Oyler and McCulley knew that Velazquez was judgment-proof.  At no time did Oyler or McCulley voice any objection to Allstate over the settlement language in the check.  Indeed, in subsequent internal agreement between Oyler and McCulley, the parties agreed how to divide the proceeds as part of a "SETTLEMENT DISTRIBUTION" Agreement, which lists the $25,000 payment as a "TOTAL SETTLEMENT."  The Allstate check is consistently referenced in the correspondence by counsel

as the "settlement check." Finally, at the time Allstate issued the check which is the subject of the present motions, the McCulleys had already been fully and separately compensated for the damage to their vehicle; the check at issue was clearly issued to compensate McCulley on his personal injury claim.

McCulley argues that the United States cannot invoke the defense of accord and satisfaction because it is not in privity of contract, and because it waived the ability to invoke the defense. Neither argument is meritorious. Kansas law would appear to permit such a defense by a third party in order to enforce the objective intent of the parties. *See Sigler v. Sigler*, 158 P. 864, 869 (Kan. 1916). And the United States clearly stated in its Answer that it would present various affirmative defenses, including "the defense of full satisfaction, release and discharge." (Dkt. No. 2, at 3). Because the court finds that the defense of accord and satisfaction is clearly applicable here, it need not resolve the additional argument advanced by defendant that the check constituted a written settlement.

Having freed the tort-feasor agent of the defendant from liability by accord and satisfaction, plaintiff has also released the employer defendant from liability under Kansas law. *Sade v. Hemstrom*, 471 P.2d 340, 347-348 (Kan. 1970); *Cobb v. Corbett*, 32 Kan. App. 2d 1184, 95 P.3d 1028 (2004). Because a private party employer would not be liable under these facts, the defendant United States cannot be. *Scroggins v. United States*, 444 F.2d 74 (10th Cir. 1971). McCulley's attempt to expand the liability of the United States beyond that of a private employer is contrary to the purpose of the Federal Tort Claims Act, and is without merit. The court will grant summary judgment to the defendant on the issue of accord and satisfaction.

The court also finds meritorious the defendant's argument that at the time of the accident Velazquez was not acting within the scope of his employment. McCulley opposes defendant's motion, arguing that Velazquez was acting within the scope of employment, while conceding that the matter may be a "close call." (Dkt. No. 117 at 17).

20

McCulley acknowledges the general rule that an employer is generally not liable when an employee is traveling to or from the workplace. *Kyle v. Postal Telegraph-Cable Co.*, 118 Kan. 300, 302, 235 P. 116 (1925). However, in support of a contrary result, McCulley stresses facts such as that Velazquez was wearing his uniform when the accident occurred, and thus subject to certain regulations, that he remained within the Army chain of command, and that he was subject to military discipline.

McCulley also cites the decision of the Delaware District Court in *Fitzpatrick v. United States*, 754 F.Supp., 1023 (D. Del. 1991), but that case is distinguishable. The accident in that case occurred when the training duty required an army sergeant was traveling from Fort Meade to other posts for training Delaware National Guard personnel. The travel required was "frequent[]," lasted "the entire weekend," occurred in a government-leased vehicle, and happened when the sergeant was driving between the officers club where he became intoxicated and his "military billet," a government-compensated motel room. 754 F.Supp. at 1026, 1035. The court concluded that the case was not a typical to-and-from case, but one in which the tort feasor was on a "special mission," at the specific direction of the employer, and so was within the scope of employment.

The other Kansas "special mission" cases cited by McCulley also involve distinctive facts. In *Pinkston v. Rice Motor Co.*, 180 Kan. 295, 303 P.2d 197 (1956), the accident occurred when the workman was specifically directed to travel to a farm auction. In *Taylor v. Centex Construction Co.*, 191 Kan. 130, 379 P.2d 217 (1963), the accident happened as the worker was returning from a trip to see the company doctor, a trip specifically directed by the employer.

In the present case, by contrast, Velazquez operated his own vehicle. He was not instructed to leave the grass-cutting site; he could have taken a lunch and consumed it there. He was given no duties by the Army at the time of the accident. Instead of remaining at the job site, he chose to travel elsewhere for lunch. He chose the route to and from the workplace. He was not compensated for his travel.

21

The case instead represents the overwhelmingly typical situation of an employee on a lunch break, the situation the Kansas Supreme Court discussed in *Walker v. Tobin Const. Co.*, 193 Kan. 701, 396 P.2d 301 (1964):

> We hold where the workman is on no mission or duty for the employer, and an accident occurs to the workman while he is off the premises of the employer during the workman's lunchtime, the accident does not arise out of and in the course of the workman's employment. We think when the employment does not contemplate work on the part of the workman during the lunch hour, the workman's trip away from and back to the premises of the employer for the sole purpose of getting lunch is indistinguishable in principle from the trip at the beginning and at the end of the work day.

193 Kan. at 704, 396 P.2d at 304.

The other factors cited by plaintiff here — generally that Velazquez remained within the chain of command and subject to military discipline — would make the exception swallow the rule. It would require a finding that any torts committed by servicemen and women were within the scope of employment.  Military personnel are always subject to such general and potential restrictions on their freedom.  Nevertheless, courts have generally held that off-duty accidents involving military personnel do not occur within the scope of duty for tort law purposes.  *See United States v. Hainline*, 315 F2.2d 153 (10th Cir. 1963).  *See also Ross v. Bryan*, 309 F.3d 830 (4th Cir. 2002); Green v. Hall, 8 F.3d 695 (9th Cir. 1993), *cert. denied*, 513 U.S. 809 (1994); *Move v. United States*, 218 F.2d 81, 83 (5th Cir. 1955).

IT IS ACCORDINGLY ORDERED this 21st day of June, 2005, that plaintiff's Motion for Extension of Time (Dkt. No. 112) is granted; plaintiff's Motion for Partial Summary Judgment (Dkt. No. 92) is denied; defendant's Summary Judgment Motions (Dkt. Nos. 96, 106) are granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE